**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**DARELL GENE TOMBLIN II,**

    **Plaintiff,**

**vs.**                          **CIVIL ACTION NO. 3:16-CV-12412**

**NANCY A. BERRYHILL,[1]**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

    **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security dying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered December 21, 2016 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 12 and 13.)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for judgment on the pleadings (Document No. 12.), **GRANT** Defendant's request to affirm the

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

decision of the Commissioner (Document No. 13.); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

<u>**Procedural History**</u>

The Plaintiff, Darrell Gene Tomblin II (hereinafter referred to as "Claimant"), protectively filed his applications for Title II benefits and for Title XVI benefits on February 27, 2013, alleging disability beginning October 16, 2009 due to "complication from broken left hip, depression, anxiety".[2] (Tr. at 205-210, 211-217, 270, 275.) His claims were initially denied on August 14, 2013 (Tr. at 123-127, 128-132.) and again upon reconsideration on October 15, 2013. (Tr. at 140-142, 143-145.) Thereafter, Claimant filed a written request for hearing on October 28, 2013. (Tr. at 146-147, 148-150.) An administrative hearing was held on April 24, 2015 before the Honorable Joseph L. Heimann, Administrative Law Judge ("ALJ"). (Tr. at 28-74.) On July 2, 2015, the ALJ entered a decision finding Claimant was not disabled. (Tr. at 7-26.) On September 3, 2015, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 6.) The ALJ's decision became the final decision of the Commissioner on November 17, 2016 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-5.) On December 21, 2016, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.) In response, the Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 9 and 10.) Subsequently, Claimant filed a Brief in Support of Motion for Judgment on the Pleadings (Document No. 12.), and in response, the Commissioner filed a Brief in Support of Defendant's Decision. (Document No. 13.) Consequently, this matter is fully briefed and ready for resolution.

---

[2] In his Disability Report – Appeal, submitted on October 17, 2013, Claimant alleged that "[t]he pain is getting worse left hip and lower back." (Tr. at 323.)

## Claimant's Background

Claimant was forty years old when he filed his applications for disability, and is defined as a "younger person" throughout these proceedings. See 20 C.F.R. §§ 404.1563(c), 416.963(c). (Tr. at 19.) Claimant completed the tenth grade, although he did not attend special education classes. (Tr. at 276.) He took the test to obtain his GED, but failed. (Tr. at 51.) He has only worked one job in the last fifteen years, as a coal miner operator. (Tr. at 276.)

## Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a prima facie case of disability.

Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of

Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through March 31, 2014. (Tr. at 12, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since October 16, 2009, the alleged onset date. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments: polysubstance abuse in early remission; degenerative disc disorder; and chronic osteoarthritis of the left hip, status post closed reduction of a fracture dislocation, along with fracture of the posterior wall of the acetabulum. (Tr. at 13, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 15, Finding No. 4.) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work as defined in the Regulations

> except that he is limited to standing or walking approximately two hours in an eight-hour work day, and sitting for up to six hours. The claimant should not operate foot

controls with his left lower extremity, should never climb ladders, ropes, or scaffolds, and should never crawl. He can occasionally perform other postural activities and occasionally balance. The claimant should avoid all exposure to concentrated levels of extreme vibration, and should avoid all exposure to unprotected heights, and to the use of hazardous machinery. The claimant also requires a sit/stand option, such that he requires the ability to stand after every 30 minutes for a period of approximately five minutes, during which he would stay on task, and then would sit down and continue working.

(Id., Finding No. 5.)

At step four, the ALJ found that Claimant was incapable of performing past relevant work. (Tr. at 19, Finding No. 6.) The ALJ then determined that based on Claimant's age, being a younger individual, his limited education, ability to communicate in English, and the immateriality of transferability of Claimant's job skills, that the RFC supported a finding that there are other jobs in the national economy that Claimant can perform. (Id. at Finding Nos. 7-10.) Ultimately, the ALJ determined that Claimant had not been under a disability from October 16, 2009 through the date of the decision. (Tr. at 20, Finding No. 11.)

**<u>Claimant's Challenges to the Commissioner's Decision</u>**

There are two primary grounds alleged by Claimant in his appeal: (1) that the ALJ improperly considered the opinions of Claimant's treating and consulting sources; and (2) that the ALJ improperly disregarded the testimony of the vocational expert who opined Claimant was incapable of substantial gainful activity. (Document No. 12 at 5.) Claimant asserts that not only did the ALJ fail to assign proper weight to the opinions of Mohit Bhardwaj, M.D., his treating psychiatrist, and of Lisa Tate, M.A., his consulting psychologist, the ALJ also did not find Claimant had severe mental impairments which conflicts with these opinions, as well as his own subjective complaints. (Id. at 5-6.) Further, the ALJ erred in his RFC assessment that Claimant was capable of sedentary work in light of his non-exertional impairments found by both treating

and consulting sources. (Id. at 6.)

Next, Claimant contends that the ALJ erred when he disregard the vocational expert's testimony that Claimant would be precluded from substantial gainful activity if he were off task in excess of acceptable tolerances. (Id.)

Claimant argues that remand for an award of benefits is proper, or alternatively, remand for a rehearing. (Id. at 7.)

In response, the Commissioner argues that Claimant did not prove that he was disabled. (Document No. 13 at 11.) Substantial evidence supported the ALJ's determination that Claimant's depressive disorder was not a severe impairment because Claimant did not satisfy his burden that it significantly interfered with his ability to perform basic mental work-related activities. (Id. at 12.) Dr. Bhardwaj's examinations revealed that Claimant's mental condition was essentially normal, and when Claimant was discharged from Prestera Center due to lack of contact, there were no mental restrictions placed upon him, particularly in light of Prestera's referral for job placement. (Id. at 13.) Additionally, Ms. Tate's consultative examination supported the ALJ's finding that Claimant's mental impairments were non-severe; the State agency psychologists' opinions were also consistent with the ALJ's finding. (Id.)

With regard to the ALJ's RFC assessment, the Commissioner asserts that the limitations therein provided more accommodation than Claimant's own testimony. (Id. at 14.) The Commissioner contends further that in light of Claimant's argument that he is limited to less than a full range of sedentary work, this is inconsistent with the vocational expert's testimony. (Id. at 15.)

Finally, the Commissioner argues that Claimant's contention that the ALJ improperly

disregarded the vocational expert's testimony that Claimant would be absent from work more than once per month or that he would need to walk around for five minutes every thirty minutes is proper, because those limitations were not based on any evidence of record. (<u>Id</u>. at 16.) In sum, the Commissioner states that substantial evidence supports the decision, and asks that it be affirmed. (<u>Id</u>. at 17.)

### The Relevant Evidence of Record[4]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

<u>Logan Regional Medical Center (LRMC):</u>

On October 16, 2009, Claimant presented to the LRMC emergency department following a car accident. (Tr. at 475.) X-rays revealed Claimant had a fracture dislocation of his left hip and a fracture of the posterior rim of the acetabulum. (<u>Id</u>.) Following closed reduction of the fracture in the emergency department, J. Andrew Hallberg, M.D., placed Claimant in a knee immobilizer and instructed him to limit his activity. (<u>Id</u>.) Claimant's pain improved dramatically over the next several days despite the fact that he was quite noncompliant while in the hospital[5] and was "uncivil" to the nurses on several occasions. (<u>Id</u>.) Because Claimant had sufficiently improved, Dr. Hallberg discharged him on October 19, 2009. (<u>Id</u>.)

On October 20, 2009, Claimant returned to LRMC emergency department and reported that his left hip had "popped out of place" and "popped back in". (Tr. at 455.) Larry Lucas, D.O.,

---

[4] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.
[5] Dr. Hallberg also noted that he "happened to run into [Claimant] just out in the community[,] [h]e was not wearing his immobilizer and report[ed] the next day in the office that he felt his hip was moving and it was painful and based on again his lack of compliance . . . my strong recommendation was that he have open reduction[.]" (Tr. at 475.)

discharged Claimant that same day and instructed him to follow up with Dr. Hallberg. (Tr. at 461.)

Claimant again presented to the LRMC emergency department on November 18, 2010, complaining of hip pain. (Tr. at 426.) He reported his pain was a seven on a scale of one to ten. (Tr. at 430.) An x-ray of his hip revealed no acute abnormality other than some osteoarthritis. (Tr. at 433.) Kevin Clark, M.D., administrated pain medication in the emergency department and prescribed Lortab and Flexeril upon discharge. (Tr. at 431.)

On August 2, 2011, Claimant returned to the LRMC emergency department after a large rock fell on his head while he was working in a coalmine (Tr. at 415.) He reported feeling very "dazed" and having a headache. (Tr. at 418.) On examination, Claimant had a normal motor examination and walked with a normal gait. (Id.) Stephen Ulaki, D.O. cleaned and closed Claimant's wound and discharged him that same day. (Tr. at 419-420.)

Claimant returned to the LRMC emergency department on three occasions in September 2011 complaining of hip pain and reporting that he had run out of narcotic pain medication. (Tr. at 408, 401, 395.) On each of these three visits, Claimant stated that he had missed his appointment with his treating physician and had run out of narcotic pain medication. (Tr. at 401, 408, 397.)

Claimant did not return to the LRMC emergency department until December 2011, when he arrived for treatment of alcohol intoxication. (Tr. at 384.) Larry Lucas, D.O. described Claimant as lethargic and smelling of alcohol. (Id.) The examining nurse found two pill bottles and a "snorting straw" in Claimant's pockets. (Tr. at 385.) One pill bottle was unmarked and contained 3 Lortab 10 mg tablets, and the other pill bottle was marked as "Temazepam 30 mg QTY 30" and had been filled that same day but only contained 13 pills. (Id.) He stated that he had received a prescription that day for 90 Lortab, denied snorting the pills, and said someone must have stolen

his pills. (Id.) Claimant was informed that he could not sign himself out against medical advice because he was "under the influence,", but Claimant removed his IV and Foley catheter and left the emergency department; Claimant's pill bottles were turned over to security. (Id.)

Cabell Huntington Hospital (Cabell):

On January 29, 2013, Claimant presented to the Cabell emergency department complaining of left hip pain and stating that he was out of his opioid pain medication. (Tr. at 663.) An x-ray of his left hip showed moderate osteoarthritis with joint space narrowing, osteophyte formation, and subchondral sclerosis. (Tr. at 669.) Claimant returned to the Cabell emergency department five days later after slipping on ice. (Tr. at 610.) X-rays of his thoracic and lumbar spine showed multilevel degenerative changes but no acute abnormalities. (Tr. at 629-630.) At discharge, Christopher H. McKeand, M.D., diagnosed Claimant with back contusion (Tr. at 614.) and prescribed opioid pain medication. (Tr. at 622.)

On February 23, 2013, Claimant returned to the Cabell emergency department complaining of hip pain. (Tr. at 603.) Sarah Schindler, FNP, a nurse practitioner, diagnosed osteoarthritis. (Tr. at 596.)

St. Mary's Medical Center (St. Mary's):

Claimant went to St. Mary's emergency department on February 8, 2013, due to left hip pain. (Tr. at 702.) Anne Corbin, M.D., diagnosed a strained left hip, administered non-narcotic pain medication, instructed Claimant to follow up with an orthopedist, and discharged him with a prescription for Lortab and Ibuprofen. (Tr. at 703.) He returned to St. Mary's emergency department on February 23, 2013, complaining of hip pain approximately seven hours after he sought treatment for hip pain at Cabell emergency department. (Tr. at 609, 696.) Krista Hale, P.A.,

a physician assistant, prescribed an opioid pain medication and a muscle relaxer. (Tr. at 697.)

On month later, Claimant went back to St. Mary's, claiming that kids had knocked his cane out from under him, and that he fell to his knees causing increased hip pain. (Tr. at 680.) Upon examination, Julie A. Smith, PA, observed that Claimant was walking with "quite a limp" because he was using his cane incorrectly. (Tr. at 681.) After proper instruction, Claimant's limp improved dramatically and he advised that he felt better. (Id.) An x-ray of his left hip showed advanced degenerative changes but no acute abnormality. (Tr. at 685.) PA Smith diagnosed osteoarthritis of the left hip and prescribed an anti-inflammatory medication and an opioid medication. (Tr. at 681.)

Claimant returned to St. Mary's emergency department on August 14, 2013 complaining of back pain. (Tr. at 713.) Brian Stanley, C.N.P., a nurse practitioner, prescribed an opioid pain medication and a muscle relaxer. (Id.)

Valley Health Primary Care (Valley Health):

Claimant initiated primary care treatment at Valley Health on June 19, 2013. (Tr. at 842.) He wanted to take part in a Suboxone program and requested a referral for an orthopedic surgeon. (Tr. at 840.) Jetta Derasin, N.P., a nurse practitioner, noted that Claimant had a decreased range of motion in his left hip. (Tr. at 842.) Nurse Derasin diagnosed arthropathy at multiple sites, gave Claimant a prescription for a cane, and provided a referral for an orthopedic surgeon. (Tr. at 843, 845.)

Claimant returned to Valley Health on November 13, 2013, and reported receiving treatment at Cabell Pain Management. (Tr. at 828.) He also explained he was taking part in a Suboxone program and was having difficulty sleeping. (Id.) Nurse Derasin prescribed medication to ease Claimant's complaints. (Tr. at 831.)

<u>Prestera Center (Prestera):</u>

On June 28, 2013, Claimant presented to Prestera and underwent an addiction evaluation. (Tr. at 722.) He admitted to using heroin 25 out of the past 30 days. (Tr. at 728.) He reported injecting heroin every day and explained that he used it to replace opioid pills. (<u>Id</u>.)

On August 20, 2013, Mohit Bhardwaj, M.D. examined Claimant, he reported using Suboxone and pain pills from the street. (Tr. at 751.) Dr. Bhardwaj observed Claimant had a low mood and constricted affect. (Tr. at 752.) Claimant denied suicidal or homicidal thoughts, was goal directed, had appropriate thought content, intact concentration, average intelligence, but poor judgment. (<u>Id</u>.) Dr. Bhardwaj diagnosed opioid dependence and drug-induced mood disorder. (Tr. at 753.) He determined Claimant had a global assessment of functioning (GAF) score of 50.[6] (<u>Id</u>.) 753).

On October 2, 2013, Dr. Bhardwaj examined Claimant, who stated his mood was fine and that he had decided against taking part in the Suboxone clinic. (Tr. at 766.) Claimant reported feeling anxious. (<u>Id</u>.) Dr. Bhardwaj continued to diagnose opioid dependence and drug-induced mood disorder and prescribed Buspar for Claimant's anxiety. (Tr. at 766, 768.)

A treatment note dated October 11, 2013 indicated that Claimant was to be transferred to another program and/or staff because he "needs a different level of care to meet needs." (Tr. at 786.) Although Claimant "continues to participate in medical services[,] [h]e has been inactive in outpatient services since 8/7/13." (<u>Id</u>.)

On November 6, 2013, Claimant saw Dr. Bhardwaj and reported that Buspar was not

---

[6] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 41-50 indicates that the person has "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> ("DSM-IV") 32 (4th ed. 1994).

helping his anxiety so he discontinued using it. It was noted that he denied being on pain medications, and did not tell Dr. Bhardwaj he was in the Suboxone clinic, which Dr. Bhardwaj discovered from the Prestera pharmacy database. (Tr. at 770.) Claimant denied experiencing suicidal thoughts. (Id.) On examination, Claimant had normal eye contact, normal motor activity, a fine mood, a goal-directed thought process, and appropriate thought content. (Tr. at 771-772.) Again, Dr. Bhardwaj diagnosed opioid dependence and drug-induced mood disorder and assessed Claimant a GAF score of 50. (Tr. at 772.)

On December 31, 2013, Chris Clagg, a staff member at Prestera, discharged Claimant from treatment. (Tr. at 788.) Treatment notes indicated that Claimant found housing and Prestera staff had not been in contact with him since he moved; it was noted that Claimant "was referred to DRS for job placement, and all other case management needs have been met." (Id.)

Lisa C. Tate, M.A.:

Lisa C. Tate, M.A., a psychologist, examined Claimant on July 30, 2013. (Tr. at 708-711.) Claimant explained that he was living at Safe Quarters, a shelter operated by Prestera Mental Health. (Tr. at 709.) He reported having depression, anxiety, and medical problems. (Id.) Claimant stated that his daily activities included watching television, taking a shower, going to the convenience store on a daily basis, sitting outside, and washing laundry. (Tr. at 711.) On examination, Claimant exhibited an anxious mood and a mildly restricted affect. (Tr. at 710.) He displayed a coherent thought process, denied perceptual disturbances, had normal judgment and fair insight, normal immediate and remote memory, mildly deficient recent memory, normal psychomotor behavior, and mildly deficient concentration. (Id.) Ms. Tate diagnosed depressive disorder with anxious features. (Id.) Ms. Tate determined that Claimant's social functioning was

within normal limits, his ability to maintain persistence and pace was within normal limits, and he had only mildly deficient concentration. (Tr. at 711.)

State Agency Physical and Mental Assessments:

On June 18, 2013, Navjeet Singh, M.D. reviewed the evidence of record and completed a physical residual functional capacity assessment. (Tr. at 82-85.) Dr. Singh found Claimant could lift and/or carry 10 pounds occasionally and 10 pounds frequently, could stand and/or walk two hours during an eight-hour workday, and sit about six hours during an eight-hour workday. (Tr. at 82.) He also found Claimant could occasionally perform postural maneuvers but needed to avoid even moderate exposure to workplace hazards. (Tr. at 83.)

On October 14, 2013, Narendra Parkshak, M.D. reviewed the medical evidence of record and affirmed Dr. Singh's physical residual functional capacity assessment. (Tr. at 93-95.)

James W. Bartee, Ph.D. reviewed the evidence of record on August 6, 2013. (Tr. at 80-81.) Dr. Bartee specifically considered whether Claimant's mental impairments met or medically equaled any of the Listings. (Id.) He determined that Claimant had a mild restriction of activities of daily living; mild difficulties maintaining social functioning; mild difficulties maintaining concentration, persistence, or pace; and no episodes of decompensation of an extended duration. (Tr. at 80.) Based on the findings of mild or none, Dr. Bartee found that Claimant's mental impairments were not severe. (Tr. at 81.) Specifically, he stated "[t]he deficits associated with the claimant's mental impairments do not impose any more than mild limitations in any of the key functional domains. The claim is assessed as non-severe due to mental disorders." (Id.)

On October 8, 2013, Jeff Boggess, Ph.D. reviewed the evidence of record and affirmed Dr. Bartee's assessment. (Tr. at 104.)

<u>Thomas Gill, M.D.:</u>

Dr. Gill, an orthopedist, examined Claimant on August 16, 2013. (Tr. at 930-931.) Claimant reported pain in his left hip that radiated down to his knee and that Lortab, Neurontin, Tramadol, and Ibuprofen gave him little relief. (Tr. at 930.) On examination, Claimant had limited range of motion and pain in his left hip. (Tr. at 931.) He also had positive Stinchfield, FABER, and FADIR tests. (<u>Id</u>.) Dr. Gill opined that all of these findings were consistent with end-stage arthritis of the left hip. (<u>Id</u>.) Dr. Gill administered a Celestone and Lidocaine injection to Claimant's left hip, and explained to Claimant that it was more prudent to exhaust all nonsurgical options prior to considering a hip replacement. (<u>Id</u>.)

<u>Daniel Poole, M.D.:</u>

Dr. Poole, a family medicine doctor, examined Claimant on August 30, 2013, due to his complaints of hip pain. (Tr. at 717-720.) Dr. Poole noted that Claimant walked with a limp and used a cane. (Tr. at 719.) He stated that his prior steroid injection in his left hip had provided some relief. (<u>Id</u>.) Dr. Poole encouraged Claimant to start physical therapy and offered to provide him with a referral to a pain management center. (<u>Id</u>.)

**The Administrative Hearing**

<u>Claimant Testimony:</u>

Claimant testified that he has lived by himself for almost a year and a half, for which he received $133 per month to help with electric and other utilities. (Tr. at 33-34.) He received food stamps as well, and has a friend who helped him with cooking, cleaning and grocery shopping. (Tr. at 34.) He does not go with his friend to the grocery store every time, he explained that it is too hard on him to go, and she can get it done faster without him. (Tr. at 44.)

Claimant testified that he walked two blocks to the hearing, and that it took him about 35-45 minutes. (Id.) Though he is supposed to use his cane, Claimant advised that when he uses it, he leans on it and his hip freezes up. (Tr. at 35.) Claimant admitted that a year ago, he could walk twenty blocks, but now he can hardly go a block without having to stop. (Tr. at 36.)

Claimant takes Gabapentin, or generic Neurontin for pain, which is non-narcotic, because he had problems with narcotics previously. (Tr. at 36, 44.) Claimant attended Treatment Center as well as NA to help him with his addiction issues. (Tr. at 36-37.) In response to questioning by the ALJ, Claimant explained that any discrepancies in his medical records and work history was due to his saying anything the doctor "wanted to hear so I could have pain medication." (Tr. at 39-42.) He also admitted to having two relapses in the last year and a half. (Tr. at 42.) He had previously received injections for his hip pain, but Claimant denied that they helped any. (Tr. at 37.)

Though it had been recommended that Claimant have surgery for his hip, he admitted that he was scared to because he had surgery on his leg once before and his recovery afterwards was very painful. (Tr. at 38.) He also did not believe surgery would "fix" his hip. (Tr. at 59.)

Claimant believed he could not do any work that allowed him to sit up and down all day working a register because of his back. (Tr. at 43.) Claimant testified that his upper back causes him pain, and his left hip hurts him all the time. (Tr. at 51.) He estimated that his hip pain is around five or six out of a pain scale from zero to ten. (Tr. at 53.) He has good days and bad days, where the pain exceeds a six, but not as high as ten, when he came out of surgery, that day was a ten. (Id.) On a good day he can get out and walk a little bit, on a bad day, he cannot get out of the house. (Tr. at 53-54.)

Due to pain, Claimant testified that his sleep is not good, and he has to keep a pillow

between his legs because of his left hip, and sleep on his right side. (Tr. at 55.) However, Claimant stated he can sit well, so long as he leans to the right, and when it goes numb, he gets up and moves around. (Tr. at 55-56.) Claimant estimated that he could sit for probably an hour to an hour and a half, then he needs to get up for about four or five minutes, to get his blood flowing. (Tr. at 56.)

Claimant testified that he was not receiving any treatment for depression or anxiety. (Tr. at 57.) He still feels depressed and anxious at times, not being able to have the things he always had. (Id.) He used to enjoy bow hunting and turkey hunting, but can no longer do those things. (Tr. at 58.)

Anthony T. Michael, Jr., Vocational Expert ("VE") Testimony:

The following hypothetical question was posed to the VE by the ALJ: an individual of Claimant's age, education, and work experience who could lift ten pounds frequently and 20 pounds occasionally, sit up to six hours during a workday, could stand and/or walk up to two hours during the workday, but could neither operate foot controls with his left leg, nor climb ladders, ropes, or scaffolds, and could never crawl, and could only occasionally balance and perform all other postural maneuvers, and who needed to avoid all exposure to concentrated levels of extreme vibration, unprotected heights, and hazardous machinery. (Tr. at 68-69.)

In response, the VE testified that an individual with the above-stated limitations could perform sedentary jobs as an inspector, sorter, and assembler. (Tr. at 69.) Given the same hypothetical in addition to a sit/stand option where every thirty minutes the individual needed to stand for about five minutes, yet remain on task, and sit back down and continue working, the VE opined that they sedentary jobs would remain, although the numbers of jobs would be reduced by fifty percent. (Tr. at 70.) If the individual would be off task during those five minutes, however,

the VE testified that the jobs he listed would not be available. (<u>Id</u>.)

In response to questions by Claimant's attorney, the VE testified that if an individual would be absent more than once per month, that person would have difficulty maintaining employment. (Tr. at 71.)

## Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). The Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). The Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, then the Court must affirm the Commissioner's decision "even should the court disagree with such decision." <u>Blalock</u>, 483 F.2d at 775.

## Analysis

<u>Evaluating Opinion Evidence:</u>

As stated previously, Claimant argues that the ALJ committed reversible error when he did not give his treating physician's opinion or the consultant psychologist's opinion appropriate weight during his analysis. (Document No. 12 at 5.) In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Ultimately, it is the responsibility of the Commissioner, not the court, to review the case, make findings of fact, and to resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons

in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(c)(2), 416.927(c)(2).

> In this case, the ALJ noted that Claimant's treating psychiatrist, Dr. Bhardwaj
>
> completed several checkbox mental status examinations, and described the claimant as having poor judgment and constricted affect, but also having appropriate thought content, normal speech, goal directed thought processes, intact concentration, and memory, average intelligence, and normal speech [*sic*]. (Tr. at 14, 752, 766.)

The ALJ further noted that throughout Claimant's sessions at the Prestera Center, he was assigned GAF scores of 50. (Tr. at 14-15, 753, 762, 778, 783.) The ALJ recognized the "transitory and subjective in nature" GAF scores and that they "do not ordinarily provide a reliable indication of a person's overall level of functioning." (Tr. at 15.) Because the treatment records contained no explanation for those assigned scores, and because they "are inconsistent with the accompanying examinations, which are essentially normal", the ALJ gave them "limited weight." (Id.) In short, the ALJ provided "good reasons" for giving "limited weight" to Dr. Bhardwaj's GAF scores.

With respect to Ms. Tate's psychological examination, the ALJ acknowledged Ms. Tate's findings that Claimant exhibited normal thought content, coherent thought processes, normal judgment, fair insight, and normal immediate and remote memory. (Tr. at 14.) Importantly, the ALJ noted Ms. Tate's opinion that Claimant's social functioning was within normal limits, that his pace and persistence appeared normal, and that he demonstrated mildly deficient concentration. (Tr. at 14, 710-711.) Ms. Tate's diagnoses of depressive disorder with anxious features were "based on the claimant's description of feeling down, losing interest in activities, feeling hopeless, and experiencing discomfort in crowds" was also noted in the decision. (Id.) The ALJ gave Ms. Tate's opinion "significant weight because it is consistent with her examination." (Tr. at 14.) The ALJ gave Ms. Tate's opinion appropriate weight under the aforementioned Regulations and provided

adequate explanation for same; she is not a treating source, and would therefore not be entitled to "controlling weight." However, it is noteworthy that the ALJ gave Ms. Tate's opinion just as much weight as he gave State agency psychological consultants, Drs. Bartee and Boggess, both of whom opined that Claimant's mental impairments were non-severe. (Tr. at 14.)

Accordingly, the undersigned **FINDS** the ALJ's evaluation of Claimant's treating physician opinion evidence as well as his evaluation of the consultative opinion evidence are supported by substantial evidence.

Determining Severe Impairment:

It is important to consider the other component to Claimant's alleged error with respect to the evaluation of the treating and consultative source opinions, that is, the ALJ failed to find his mental impairments severe. A "severe" impairment is one "which significantly limits your physical or mental ability to do basic work activities." See 20 C.F.R. §§ 404.1520(c), 416.920(c); see also Id. §§ 404.1521(a), 416.921(a). "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs." Id. §§ 404.1521(b), 416.921(b). The Regulations provide examples of these activities: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, coworkers and usual work situations; and (6) dealing with changes in a routine work setting. Id. Contrariwise, an impairment may be considered " 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984).

The ALJ expressly found that Claimant's mental impairment of depressive disorder was "nonsevere" because it "does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities." (Tr. at 13.) Further, the ALJ noted that Claimant had a limited psychological treatment history, and his medical records "generally indicate an absence of psychological symptoms or complaints." (Tr. at 13, 820, 829, 830, 833, 834, 837, 838, 840, 842.) The ALJ found that Claimant had no limitations in his activities of daily living, as he was independent in his personal care, does laundry, watches television, can use public transportation, and attributed any functional limitations to same primarily to his physical ailments as opposed to mental impairment. (Tr. at 13, 289-299, 711.) Moreover, the ALJ found that the evidence supported no more than mild limitations in social functioning, and that despite Claimant's allegations of being more socially withdrawn and experiencing anxiety in crowds, he relates well with others, and at the hearing, the ALJ found him to be "pleasant." (Tr. at 13-14, 72.) Regarding Claimant's concentration, persistence or pace, the ALJ also found mild limitations, specifically due to Ms. Tate's findings that his pace and persistence were within normal limits, although he had some trouble with calculations. (Tr. at 14, 710, 711.) The ALJ also noted that Claimant reported being able to use public transportation, and can handle stress and changes in routine. (Tr. at 14, 292, 295.) There was no evidence Claimant experienced any episodes of decompensation of extended duration. (Tr. at 14.)

Contrary to Claimant's argument that Dr. Bhardwaj's GAF scores and Ms. Tate's diagnosis of depressive disorder with anxious features suggested that Claimant's mental impairments were "severe", the record shows that Claimant's medically determinable impairments were not, as the evidence of record does not demonstrate that Claimant's ability to perform basic mental work

activities was "significantly limited" by any mental impairment. 20 C.F.R. §§ 404.1520(c), 416.920(c). There is no opinion evidence in the record that Claimant's mental impairments impeded his ability to work, indeed, it is also notable that records regarding Claimant's mental health treatment at Prestera indicate he dropped out of the outpatient program and he had been referred for job placement.

Accordingly, the undersigned **FINDS** that the ALJ's determination that Claimant's mental impairment was non-severe is based upon substantial evidence.

<u>Evaluation of Symptoms in Disability Claims:</u>

Claimant indicated that the ALJ improperly considered his credibility because his complaints of pain were reasonable in light of the conditions of his hip, back and legs, and further, because his complaints of depression were corroborated by both treating and consulting sources. (Document No. 12 at 5-6.) Social Security Ruling 96-7p[7] clarifies the evaluation of symptoms, including pain: 20 C.F.R. §§ 404.1529, 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements. <u>See</u> <u>also</u>, <u>Hammond v. Heckler</u>, 765 F.2d 424, 426 (4th Cir. 1985).

The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This

---

[7] The undersigned is aware that this Ruling has been superseded by SSR 16-3p, effective March 28, 2016, however, the former Ruling applies to the ALJ's decision herein, having been issued on July 2, 2015. <u>See</u>, SSR 16-3p, 2016 WL 1131509.

includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

As an initial matter, credibility determinations are properly within the province of the adjudicator and beyond the scope of judicial review. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Davis v. Colvin, 3:13-CV-23399, 2015 WL 5686896, at *7 (S.D.W. Va. Sept. 8, 2015) ("The credibility determinations of an administrative judge are virtually unreviewable on appeal.") After properly performing the two-step process[8] (Tr. at 16.), the ALJ proceeded to review the evidence of record and reconciled it with Claimant's statements concerning the intensity, persistence and limiting effects of his symptoms. (Tr. at 16-19.) With respect to his mental impairments, the ALJ noted that "[h]e experiences anxiety and sometimes feels depressed over his inability to provide for his family, but has not received psychological treatment." (Tr. at 16.) With respect to his left hip issue, the ALJ further noted that Claimant did not pursue significant medical treatment during the last part of 2013, throughout 2014 or into 2015 until the hearing date. (Tr. at 17.) Further, "physical examinations throughout this period were essentially normal." (Tr. at 18, 820, 830, 834, 838, 842.) With respect to Claimant's back, the ALJ recognized that despite his complaints of pain, Claimant was instructed to care for his back pain with over-the-counter

---

[8] See, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

medication, heat, ice, and massage. (Tr. at 18, 615, 713-176.) It was further noted that on other occasions, records indicated Claimant's back was "normal" "or it is not mentioned as an area of concern." (Tr. at 18, 819, 830, 838, 842.) Ultimately, the ALJ determined that Claimant's allegations that he was unable to perform any work were not credible for numerous reasons: he admitted he could sit for 60 to 90 minutes before needing to stand for four or five minutes; he admitted he walked to the hearing and to his consultative examination, despite allegations he could not walk for extended periods; the records show he can control his symptoms with routine conservative medical treatment; despite his continued complaints of pain, he declined to pursue more aggressive treatment; and he had limited treatment over the prior year and a half, despite having a medical card. (Tr. at 18.) At the end of his analysis, the ALJ found that though the medical evidence indicates he has some limitations, and that Claimant may be unable to return to work as a coal miner, the record did not demonstrate his limitations were debilitating. (Id.)

Given the conflicting evidence consisting of Claimant's allegations of pain and other symptoms with the objective and other evidence of record, the ALJ is responsible for resolving the conflict; the issue before the Court is not whether Claimant is disabled, but whether the ALJ's finding is supported by substantial evidence and was reached based upon a correct application of the relevant law. See, Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1995). There is no treating opinion or other opinion evidence in the record finding Claimant disabled, from either his physical or mental impairments; from this standpoint, the ALJ only had his subjective complaints and diagnoses available to determine whether he was disabled, which in and of themselves are not disabling impairments. See, Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986.) The ALJ

concluded that Claimant's "impairments create functional limitations. However, his limitations are accommodated by this residual functional capacity assessment." (Tr. at 19.)

The undersigned **FINDS** the ALJ's discussion of the objective and other evidence of record in his evaluation of Claimant's statements regarding the intensity, persistence, and limiting effects of his symptoms, and that the ALJ's conclusion that Claimant's allegations of disabling pain and other limitations were not supported by the evidence of record complied with the applicable law, and further, is supported by substantial evidence.

The RFC Assessment:

Claimant contends that the ALJ erred by stating Claimant was capable of sedentary work, and failed to consider Social Security Ruling 96-9p regarding RFC assessments for less than a full range of sedentary work, expressly in light of Claimant's "nonexertional impairments enumerated by his consulting and treating sources." (Document No. 12 at 6.) Residual functional capacity represents the *most* that an individual can do despite his limitations or restrictions. See Social Security Ruling 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC determination is an issue reserved to the Commissioner. See Id. §§ 404.1527(d), 416.927(d).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

In this case, the ALJ did not find Claimant capable of less than a full range of sedentary work, but limited him "to a restricted form of light work." (Tr. at 19.) The undersigned **FINDS** that Claimant's argument to that extent lacks merit. Nevertheless, as discussed above, the ALJ explained why Claimant's mental impairments provided no restrictions in his RFC. Moreover, there simply was no evidence that indicated Claimant had such non-exertional impairments that affected the RFC assessment.

Lastly, despite Claimant's argument that the ALJ improperly disregarded the VE's testimony that should he be absent and/or off task in excess of acceptable tolerances (Document No. 12 at 6.), the undersigned agrees with the Commissioner that there simply was no evidence of record that supported such an assertion. See, generally, Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005) (stating that a hypothetical question is unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence); see also, Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989) (concluding that an ALJ's hypothetical question need only include those limitations supported by the record). (Document No. 13 at 16.)

In accordance with this Court's duty to scrutinize the record as a whole in order to determine if the Commissioner's conclusions were rational, as noted *supra*, the undersigned **FINDS** that the ALJ's consideration of and resolution of Claimant's limitations and abilities, both physical and mental, were "rational", resulting in an RFC assessment that was based upon substantial evidence. Oppenheim v. Finch, 495 F.2d at 397.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's motion for judgment on the pleadings (Document No. 12.), **GRANT** the Defendant's request to affirm the decision below (Document No. 13.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of

such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: June 13, 2017.

Omar J. Aboulhosn
United States Magistrate Judge